**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**October 2, 2013**

# In the Court of Appeals of Georgia

A13A1063. IN THE INTEREST OF L. P., A CHILD.

MILLER, Judge.

Following a bench trial, a juvenile court found L. P. delinquent for committing the offenses of participation in criminal street gang activity (OCGA § 16-15-4 (a)), possession of a firearm by a person under the age of 18 (OCGA § 16-11-132 (b)), theft by receiving stolen property (OCGA § 16-8-7), and carrying a weapon without a license (OCGA § 16-11-126 (a)). L. P. now appeals, contending that the trial court erred in denying his motion to suppress and in admitting into evidence printouts from a Facebook page. L. P. also asserts that the evidence was insufficient to prove beyond a reasonable doubt that he committed the offense of participation in a criminal street gang. For the reasons that follow, we affirm.

To prove that a juvenile is delinquent for committing acts of a criminal nature, the State must prove the commission of these acts beyond a reasonable doubt, just as it would in a criminal prosecution of an adult for the same acts. So, when a juvenile challenges the sufficiency of the evidence, we apply the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 [99 SCt 2781, 61 LE2d 560] (1979), and we consider whether the evidence adduced at the hearing would permit a rational trier of fact to conclude beyond a reasonable doubt that the juvenile committed the acts with which he is charged. In considering the sufficiency of the evidence, we view the evidence in the light most favorable to the adjudication below, keeping in mind that it is for the trier of fact, not this Court, to weigh this evidence, resolve any conflicts in the evidence, and assess the credibility of witnesses.

(Citations and punctuation omitted.) *In the Interest of H. A.*, 311 Ga. App. 660, 661 (716 SE2d 768) (2011).

So viewed, the evidence shows that around 4:00 a.m. on July 7, 2012, police officers with the Griffin Police Department were dispatched to a shoot-out at a J.R. Cricket's club. Upon arriving at the scene, police officers learned from an eyewitness that individuals from a gang on the south side of Griffin ("Southside gang") had opened fire on a gang from the east side and then left the scene in a silver colored Honda Accord. The Honda Accord was subsequently spotted on the south side of Griffin, and officers initiated a traffic stop.

During the stop, Lieutenant Curtis Keys observed another vehicle, a Chevy Malibu, driving down the road. Lieutenant Keys recognized the driver of the Chevy

Malibu and L. P., who was sitting in the passenger seat, from dealing with them on the streets. There were at least three other passengers in the backseat. Lieutenant Keys got in his patrol car and briefly followed the Malibu before activating his patrol lights. Lieutenant Keys noticed that all of the males in the Malibu, including L. P., were from the east side of Griffin. Lieutenant Keys pulled over the Malibu about a block away from where the alleged shooter in the Honda Accord lived. Other officers came to assist in the stop, and upon the officers' approach to the Malibu, the driver opened his door because his window would not go down. The officer closest to the driver's side observed a gun in plain view, asked the driver to get out of the vehicle, and alerted the other officers about the gun. Lieutenant Keys pulled L. P. out of the vehicle, patted him down, and discovered a loaded .38-caliber revolver in his shorts pocket. L. P., who was16 years old at the time of the stop, did not have a permit for the revolver. Officers subsequently discovered that the revolver had been reported stolen out of Pike County in 2011.

L. P. was placed into custody and transported to the police department. L. P. was read his *Miranda* rights, and he signed a waiver of rights form. During the police interview, L. P. admitted that he and his friends associated with a group called Alley

Mob Bosses ("AMB"). Lieutenant Mike Richardson, a detective with prior training on gang identification, identified AMB as a gang from the east side of Griffin.

Using L. P.'s known street name, "Alley for Real," Lieutenant Richardson found a user profile on Facebook that used the identity "Alley for Real," listed a birth month and day that matched L. P.'s, and included pictures of L. P. The Facebook page also contained comments about freeing the user's brother, and at the time of the posts, L. P.'s brother was incarcerated. The Facebook page contained profile pictures of L. P. making gang signs and had the phrases "AMB" and "Blood killers" edited onto some pictures.

Following the bench trial, the juvenile court judge found that sufficient evidence supported all the charges against L. P. and adjudicated him delinquent.

1. L. P. argues that the juvenile court erred in denying his motion to suppress because the officer lacked a reasonable, articulable suspicion to stop the vehicle in which he was a passenger. We disagree.

On appeal of the denial of a motion to suppress, we construe the facts in favor of the trial court's findings, uphold the trial court's findings unless clearly erroneous, and review de novo the trial court's application of the law to the facts. *Barrett v. State*, 289 Ga. 197, 200 (1) (709 SE2d 816) (2011); *Sommese v. State*, 299 Ga. App.

4

664, 665 (683 SE2d 642) (2009). Moreover, in reviewing a trial court's decision on a motion to suppress, we may consider all relevant evidence of record, including evidence introduced at trial. See *Pittman v. State*, 286 Ga. App. 415, 416 (650 SE2d 302) (2007).

> An investigative stop that is made based upon a police officer's reasonable suspicion that a person is, or is about to be, engaged in criminal activity does not violate the Fourth Amendment. To establish the necessary reasonable suspicion to make an investigative stop, the totality of the circumstances must show that the officer had specific and articulable facts which, taken together with rational inferences from those facts, provided a particularized and objective basis for suspecting the particular person stopped of criminal activity. Police officers are permitted to draw reasonable inferences and deductions based upon their own experience and training when assessing whether the cumulative information available to them authorizes an investigatory stop.

(Citations and punctuation omitted.) *Taylor v. State*, 296 Ga. App. 481, 482 (675 SE2d 504) (2009).

Here, Lieutenant Keys, the officer who conducted the stop, had received information from an eyewitness that the shoot-out at J.R. Cricket's involved Eastside and Southside gangs, the shooter left in a silver Honda Accord, and the shooter could be found in the area near Pamela Drive and George Circle. About an hour after the shooting, while officers were conducting a stop of the suspected shooter near Pamela Drive in south Griffin, Lieutenant Keys observed a Chevy Malibu driving slowly

5

down the road. Lieutenant Keys shone his light into the car and recognized L.P. and the other occupants of the Malibu as being "Eastside guys" based on prior contacts with them. More importantly, Lieutenant Keys saw the suspected victim of the prior shooting in the Chevy Malibu. Lieutenant Keys also testified that in his experience, right after a shooting, individuals would load up in a car and go searching for the person who shot at them. Under the totality of these circumstances, Lieutenant Keys had a particularized and objective basis for suspecting that L. P. and the other occupants of the Chevy Malibu were or were about to be involved in criminal activity. Therefore, the trial court did not err in denying L. P.'s motion to suppress.

2. L. P. also contends that the trial court erred in admitting printouts from a Facebook page belonging to "Alley for Real," because the State failed to provide a proper foundation showing that the Facebook page belonged to L. P. We disagree.

> Admissibility of evidence is a matter which rests largely within the discretion of the trial court. Any evidence is relevant which logically tends to prove or disprove any material fact which is at issue in the case, and every act or circumstance serving to elucidate or throw light upon a material issue or issues is relevant. Georgia law favors the admission of any relevant evidence, no matter how slight its probative value, and even evidence of questionable or doubtful relevancy or competency should be admitted and its weight left to the jurors.

(Punctuation and footnotes omitted.) *Ward v. State*, 274 Ga. App. 511, 513-514 (3)

(618 SE2d 154) (2005). Documents from electronic sources, such as the printouts

from a website like Facebook, are subject to the same rules of authentication as other

documents and may be authenticated through circumstantial evidence.[1] See *Burgess*

*v. State*, 292 Ga. 821, 823 (4) (742 SE2d 464) (2013); *Smoot v. State*, 316 Ga. App.

102, 109 (4) (a) (729 SE2d 416) (2012).

> As a general rule, a writing will not be admitted into evidence unless the offering party tenders proof of the authenticity or genuineness of the writing. There is no presumption of authenticity, and the burden of proof rests upon the proffering party to establish a prima facie case of genuineness. Printouts of web pages must first be authenticated as accurately reflecting the content of the page and the image of the page on the computer at which the printout was made before they can be introduced into evidence. Then, to be relevant and material to the case at hand, the printouts often will need to be further authenticated as having been posted by a particular source.

(Citations and punctuation omitted.) *Smoot*, supra, 316 Ga. App. at 109-110 (4) (a).

Here, prior to the entry of the Facebook profile page into evidence, the

detective testified that he was familiar with L. P.'s street name, "Alley for Real." The

detective accessed Facebook on his computer, conducted a search for "Alley For

---

[1] This case was tried before January 1, 2013, which was the effective date of Georgia's new evidence code, including OCGA § 24-9-901 ("Requirement of authentication or identification").

Real," and printed the documents from his printer while observing the Facebook profile page for "Alley Forreal." The detective testified that the printouts fairly and accurately depicted what he observed on his computer screen. The detective, who had previously interviewed L. P., identified L. P. in pictures posted on the Facebook page, and testified that the biographical information listed on Facebook, such as day and month of birth, matched L. P.'s.

Based on this evidence, the trial court was authorized to conclude that the State sufficiently authenticated the printouts as accurately reflecting the content of the Facebook page, and that the material was posted by L. P. See *Burgess*, supra, 292 Ga. at 823-824 (4) (screen shot from My space website was sufficiently authenticated where profile page belonged to a person who went by defendant's nickname, listed biographical information matching that of defendant, and contained images that were of the defendant); *Smoot*, supra, 316 Ga. App. at 105, 110 (4) (a) (printouts from website accurately and fairly represented website actually viewed, and circumstantial evidence linked the website to the defendant where defendant's business card listed the website's address, the website had images of the defendant using the name "Gold," and the website had the statement "Created by Gold"). Whether the subject Facebook page actually belonged to L. P. was an issue affecting the weight of the

8

evidence, not its admissibility, and was ultimately an issue for the jury to decide. See *Brown v. State*, 291 Ga. 892, 897 (3) (734 SE2d 23) (2012); *Clark v. State*, 283 Ga. App. 884, 887 (2) (642 SE2d 900) (2007). Consequently, the juvenile court did not abuse its discretion when it admitted the printout of the Facebook profile page into evidence. See id.

3. L. P. lastly contends that the evidence was insufficient to support the juvenile court's finding that he committed the crime of participation in criminal street gang activity under OCGA § 16-15-4 (a). We disagree.

OCGA § 16-15-4 (a) makes it "unlawful for any person employed by or *associated with* a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." (Emphasis supplied.) OCGA § 16-15-3 (1) defines "criminal gang activity" as "the commission, attempted commission, conspiracy to commit, or solicitation, coercion, or intimidation of another person to commit any of [certain enumerated] offenses[.]" Those enumerated offenses include any crime "that involves violence, possession of a weapon, or use of a weapon . . . ." OCGA § 16-15-3 (1) (J). Additionally, under OCGA § 16-15-3 (2), a "criminal street gang" is defined as

9

> any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity as defined in paragraph (1) of this Code section. The existence of such organization, association, or group of individuals associated in fact may be established by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics[.]

For purposes of defining "criminal street gang," our Supreme Court has directed that "the actor is the group acting through its members." *Rodriguez v. State*, 284 Ga. 803, 806 (1) (671 SE2d 497) (2009). Since the statute clearly contemplates that common names and symbolic identifiers may be used to establish the existence of a gang and that its members are "associated in fact," we have held that evidence of symbols, tattoos, graffiti, attire, or other distinguishing characteristics may establish the existence of a "criminal street gang." See *In the Interest of X.W.*, 301 Ga. App. 625, 628 (2) (688 SE2d 646) (2009). Additionally, "participation with others in that criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes." (Citations and punctuation omitted.) *Rodriguez*, supra, 284 Ga. at 807 (1). As a result, "a conviction under OCGA § 16-15-4 (a) requires that there be some nexus between the enumerated act and an intent to further street gang activity." (Citation and punctuation omitted.) *In the Interest of C.P.*, 296 Ga. App. 572, 575 (675 SE2d 287) (2009).

10

Here, Lieutenant Richardson testified that he had served on a Gang Task Force for the Griffin Police Department, had received gang identification training, and, with the assistance of other officers, had tracked the gang affiliation for individuals that the police department had previously arrested. Lieutenant Richardson testified that AMB was a gang from the east side of Griffin, its members distinguish themselves by wearing the color blue, and the gang has established itself as part of the Crips. Lieutenant Richardson further testified that several AMB members had been arrested for firearms and drug offenses. The evidence also showed that on the Facebook page linked to L. P., he referred to the Crips, he was identified in pictures wearing a blue bandanna that Lieutenant Richardson described as the "universal flag for Crips," and there were photographs containing the phrases "AMB" and "Blood killer." L. P. also admitted that he frequently associated with AMB. Consequently, the evidence was sufficient to support a finding that L. P. was a member of a criminal street gang, which was involved in criminal gang activity.

Moreover, there is also evidence that L. P. participated in criminal gang activity. Specifically, it is undisputed that L. P. committed an enumerated offense of possession of a firearm referenced by OCGA § 16-15-3 (1) (J). As described above, officers received information that an individual from a Southside gang had shot at

11

males from an Eastside gang. Lieutenant Richardson testified that the target of the shooting was known to associate with AMB, and about an hour after the shooting, L. P. was in a vehicle with the intended victim, along with other males from the east side. L. P. and other Eastside males were stopped about a block from where the suspected shooter resided, and L. P. possessed a loaded firearm. Lieutenant Richardson also testified at one point that in his experience, gang members generally seek to retaliate against another gang for prior acts of violence. Based on this evidence, the juvenile court was authorized to conclude that L. P. committed an act which, if he had been adult, would have resulted in a conviction of participation in criminal gang activity. See *In re C. P.*, supra, 296 Ga. App. at 575-576 (evidence supported juvenile's participation in criminal gang activity for carrying concealed weapon and committing theft by shoplifting where juvenile was arrested at store after shoplifting, he was carrying knifes at time of arrest, and he carried symbols and codes showing association with a gang). Accordingly, we affirm the juvenile court's adjudication of delinquency.

*Judgment affirmed. Barnes, P. J., and Ray, J., concur.*